UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOMAS L. KOWALAK,

       Petitioner,

                                CASE NO. 01-CV-40009-FL
v.                                JUDGE STEPHEN J. MURPHY, III
                                MAGISTRATE JUDGE PAUL J. KOMIVES

DEBRA SCUTT,

       Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.    RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.   REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . 5
    C.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    E.    *Actual Innocence/Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . 20
        1.    *Actual Innocence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        2.    *Sufficiency of the Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    F.    *Evidentiary Claims (Claims IV-VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        1.    *Evidentiary Claims Generally* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        2.    *Hearsay Evidence and Confrontation (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . 27
            a. Background Relating to Moore's Testimony . . . . . . . . . . . . . . . . . . . . . . . 27
            b. Admission of Hearsay Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            c. Confrontation Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
        3.    *Scientific Evidence (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        4.    *Exclusion of Hearsay Evidence and Right to Present a Defense (Claim VI)* . . . . . . . . 36
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    G.    *Jury Claims (Claims VII & IX)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
        1.    *Instructional Error (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        2.    *Extraneous Influence (Claim IX)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
            a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
            b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    H.    *Suppression of Evidence (Claim VIII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
            a. Witness Identity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        b.  Destruction of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
        c.  Discovery Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
I.     *Speedy Trial (Claim X)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
    1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
J.     *Ineffective Assistance of Counsel (Claims II & III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
        a.  Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
        b.  Appellate Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
K.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*       *       *       *       *

I.     <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.    *Procedural History*

    1.    Petitioner Tomas L. Kowalak is a state prisoner, currently confined at the G. Robert Cotton Correctional Facility in Jackson, Michigan.

    2.    Petitioner was charged with first degree murder in connection with the murder of his mother.  Prior to trial, petitioner filed an application for leave to file an interlocutory appeal, raising the following claim:

> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO QUASH AND/OR SUPPRESS NANCY MOORE'S TESTIMONY CONCERNING THREATS DEFENDANT ALLEGEDLY MADE TO THE HOMICIDE VICTIM.

The court of appeals initially denied petitioner's application for leave to appeal in a standard order. *See People v. Kowalak*, No. 186736 (Mich. Ct. App. July 17, 1995).  Petitioner filed an application for leave to appeal in the Michigan Supreme Court which, in lieu of granting leave to appeal, remanded to the court of appeals for consideration of petitioner's claim as on leave granted.  *See People v. Kowalak*, 449 Mich. 909, 538 N.W.2d 676 (1995).  On remand, the court of appeals

rejected petitioner's claim, concluding that the victim's hearsay statements to Nancy Moore were properly admissible as excited utterances under MICH. R. EVID. 803(2).  *See People v. Kowalak*, 215 Mich. App. 554, 546 N.W.2d 681 (1996).  Petitioner filed an application for leave to appeal this decision to the Michigan Supreme Court, which denied the application in a standard order.  *See People v. Kowalak*, 453 Mich. 947, 557 N.W.2d 308 (1996).

3.     On March 21, 1997, petitioner was convicted of first degree murder, MICH. COMP. LAWS § 750.316, following a jury trial in the Oakland County Circuit Court.  On April 29, 1997, he was sentenced to a mandatory term of life imprisonment without possibility of parole.

4.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, a single claim:

> WHERE A PERIOD IN EXCESS OF FOUR YEARS ELAPSED BETWEEN THE DATE THE DEFENDANT-APPELLANT ALLEGEDLY PERPETRATED THE OFFENSE HE WAS CHARGED WITH AND THE DATE HIS JURY TRIAL COMMENCED, WAS THE DEFENDANT-APPELLANT IMPERMISSIBLY DEPRIVED OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A "SPEEDY" TRIAL ON THE CHARGE THAT HAD BEEN LEVIED AGAINST HIM?

The court of appeals found no merit to petitioner's claim, and affirmed his conviction and sentence. *See People v. Kowalak*, No. 203164 (Mich. Ct. App. Nov. 20, 1998) (per curiam).

5.     Petitioner, proceeding *pro se*, sought leave to appeal this issue to the Michigan Supreme Court, as well as an additional claim that his appellate counsel rendered constitutionally ineffective assistance.  The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Kowalak*, 461 Mich. 925, 604 N.W.2d 684 (1999).

6.     On February 13, 2001, petitioner filed a *pro se* application for the writ of habeas corpus, raising the following grounds for relief: (1) actual innocence and insufficient evidence; (2)

3

ineffective assistance of appellate counsel; (3) ineffective assistance of trial counsel; (4) improper admission of hearsay evidence; (5) improper admission of unreliable scientific evidence; (6) denial of the right to present a defense by the exclusion of a defense witness's hearsay testimony; (7) improper jury instruction on premeditation; (8) suppression and destruction of evidence; (9) denial of an impartial jury through an extraneous jury influence; and (10) denial of a speedy trial. Respondent moved for summary judgment on the ground that all but two of petitioner's claims were unexhausted. On September 21, 2001, the Court entered an order dismissing the petition without prejudice based on petitioner's failure to exhaust his state court remedies.

7.      On November 9, 2001, petitioner mailed a motion for relief from judgment pursuant to MICH. CT. R. 6.500-.508 to the trial court. On November 20, 2001, the motion was returned to petitioner because the brief in support exceeded the page limit. Petitioner subsequently attempted to refile his motion, to no avail. Petitioner then filed an application for leave to appeal in the Michigan Court of Appeals, raising the claims asserted in his habeas petition as well a claim that the trial court had erred in rejecting his motion for relief from judgment. On May 5, 2003, the court of appeals denied petitioner's application for leave to appeal in a standard order, "for lack of merit in the grounds presented." *People v. Kowalak*, No. 243592 (Mich. Ct. App. May 5, 2003). Petitioner thereafter filed an application for leave to appeal in the Michigan Supreme Court, which denied the application in a standard order. *See People v. Kowalak*, 469 Mich. 1044, 679 N.W.2d 69 (2004).

8.      On May 5, 2004, petitioner filed a motion to reinstate his habeas petition, asserting that he had exhausted his state court remedies. Respondent again moved to dismiss the petition for lack of exhaustion. The Court granted the motion and dismissed the petition without prejudice on November 29, 2004.

9.      Petitioner returned to state court, filing another motion for relief from judgment which relied on his earlier brief.  The trial court affirmed its earlier conclusion that the brief exceeded the applicable page limit, and limited its consideration to the first 25 pages of petitioner's brief.  The trial court denied the motion because petitioner's claims were either previously raised on appeal and decided against him, MICH. CT. R. 6.508(D)(2), or could have been raised on direct appeal and petitioner did not have good cause for his failure to do so, MICH. CT. R. 6.508(D)(3).  *See People v. Kowalak*, No. 93-123822-FC (Oakland County, Mich., Cir. Ct. July 27, 2005).  Petitioner's subsequent applications for leave to appeal in the Michigan Court of Appeals and Michigan Supreme Court were denied in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." *People v. Kowalak*, 477 Mich. 943, 723 N.W.2d 859 (2007); *People v. Kowalak*, No. 267158 (Mich. Ct. App. June 22, 2006).

10.      Petitioner returned to this Court on December 15, 2006, filing a motion to reinstate his case.  On July 18, 2007, the Court granted the motion and reinstated petitioner's action.

11.      Respondent filed her answer on November 10, 2008.  She contends that petitioner's speedy trial claim is without merit, and that petitioner's remaining claims are barred by petitioner's procedural default in the state courts.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner was convicted of murdering his mother, Jessie Kowalak.  The evidence adduced at trial was accurately summarized in the prosecutor's brief on petitioner's direct appeal from his conviction:

> The first witness to testify on behalf of the People was Officer Steven Worton of the City of Madison Heights Police Department.  (Transcript 3-13-97, hereinafter T, 153.)  Officer Worton was on duty on February 24, 1993.  (T, 154.)  That evening, Officer Worton received a call to check "on the welfare of a woman."  (T, 154.)  As

5

he proceeded to the address given to him by his dispatcher, the call was upgraded to an "assist rescue" and "a woman down, not breathing." (T, 154.)

Officer Worton arrived at the address on Dartmouth in the City of Madison Heights at approximately 8:00. (T, 155, 174.) He was met out front of the residence by Nancy Moore who took him into the house and led him to a woman that was laying on the living room floor. (T, 155.) The woman (which he identified as Jessie Kowalak) was laying flat on her back in front of a chair and had a mark (what appeared to be a bruise) on the right jawline. (T, 155-156, 165.) The bruise on Jessie's jaw made Officer Wortoin believed [sic] that something criminal may have occurred. (T, 166.)

The fire department arrived at the scene and Jessie was turned over to them. (T, 166.) At that time, Officer Worton called his supervisor to request that some detectives come to the scene. (T, 166, 168.)

Officer Worton looked for signs of forced entry into the residence, but could find none. (T, 174.) He asked Nancy Moore if the front door of the residence had been locked. (T, 179.) Moore replied, "Yes, the door was locked." (T, 179.)

The next witness to take the stand on behalf of the People was Mark Ehrke, a firefighter with the City of Madison Heights. (T, 186.) Ehrke testified that he was an Emergency Medical Technician licensed by the State of Michigan and was certified in CPR and how to handle basic emergencies. (T, 186, 187.)

During the evening hours of February 24, 1993, Ehrke responded to 25620 Dartmouth. (T, 197.) He entered the home and found an elderly woman lying on the floor. (T, 188.) He found that the woman was not breathing and did not have a pulse. (T, 188-189.) The paramedics attached an automatic external difibulator [sic] to the woman, which indicated that she did not have a "shockable rhythm." (T, 189.) This indicated that the woman was dead. (T, 189.)

The next witness to testify on behalf of the People was Yvonne Kowalak. (T, 191.) Yvonne married Defendant on July 22, 1981, and divorced him in October of 1989. (T, 194.) Yvonne and Defendant had two (2) children, Eric and Brant. (T, 194.) Jessie Kowalak was Yvonne's mother-in-law. (T, 194.)

In 1993, Yvonne and Defendant's children were five (5) and three (3) years old. (T, 196.) On February 24, 1993, a hearing was held in the Oakland County Circuit Court before the Honorable Barry Howard to determine where Defendant would have visitation rights with his children. (T, 197.) Yvonne asked Jessie Kowalak to testify against Defendant because she was concerned that Judge Howard was going to grant visitation rights to Defendant. (T, 198.)

At approximately noon on that date, Yvonne picked Jessie up and drove to the courthouse. (T, 198, 222.) At the hearing, Jessie testified against Defendant.[1] (T, 198, 208.) At the conclusion of the hearing, Judge Howard denied Defendant the ability to have visitation with his children. (T, 208-209.) At approximately 3:00 p.m., the proceedings before Judge Howard concluded. (T, 209.)

[1]At trial, a videotape of a portion of the proceedings from that date were played to the jury. It was transcribed as follows:

THE COURT: Mrs. Kowalak, I'm going to put you under oath.  Do you swear to tell the truth, the whole truth, and nothing but the truth, so help you?

THE WITNESS: I do.

THE COURT: Tell me what you want to tell me.

THE WITNESS: Okay.  I am Tom's mother.  I am the grandmother to these two little boys.  Tom is an alcoholic, and I feel he should not be involved with those little boys.

THE COURT: Is there anything else you want to say?

THE WITNESS: Well, do you want to ask me anything?  Now, at the present time, since November, he has been living with me.  He had been living with his girlfriend in Hazel Park.  He is now with me.

Every weekend, that he has money, he spends on a drunk [sic].

(Transcript, 3-14-97, hereinafter T II, 28-29.)

Yvonne and Jessie walked out of the courthouse together.  (T, 209.)  As they left the courthouse building, Defendant was standing outside the vestibule (the second set of doors) lighting a cigarette.  (T, 209, 224-225.)  Defendant leaned his head towards Jessie (who was to the right of Yvonne) and said something to her.  (T, 210, 225-226.)  Yvonne could not hear anything that was said.  (T, 210, 226.)

When Yvonne and Jessie got to the car, Jessie was crying.  (T, 210.)  Yvonne then took Jessie to her home on Dartmouth at approximately 3:30.  (T, 210-211.)  Yvonne asked Jessie if she wanted her to stay with her, but Jessie declined.  (T, 211.)  Yvonne then went home.  (T, 211.)

At approximately 6:40 p.m., Yvonne telephoned Jessie.  (T, 211.)  However, Jessie did not answer the phone.  (T, 211.)  Yvonne kept calling and got no answer.  (T, 211.)  She began to get worried, so she called the Madison Heights Police Department.  (T, 212.)  She asked them to check on Jessie because she was not answering the telephone.  (T, 212.)

Yvonne testified that she had never seen Defendant drive Jessie's vehicle, unless Jessie was in the vehicle.  (T, 215, 216.)  On cross-examination, Yvonne testified that, at the time of the divorce, it was initially Defendant who had custody of the children.  (T, 217.)

The next witness to testify on behalf of the People was Nancy Moore.  (T II, 30.)  Moore testified that she had lived with Rex Kowalak (Defendant's brother) for ten (10) years.  (T II, 31.)  She called Jessie Kowalak her mother in law and knew her well.  (T II, 32.)

Moore spoke with Jessie by telephone on February 23, 1993, at 3:30, after Jessie come home from the court hearing.  (T II, 34, 56.)  Jessie was "petrified" and "scared to death."  (T II, 36, 38.)  Moore immediately went over to Jessie's house.  (T II, 38.)  Jessie let Moore into the house and immediately locked the door.  (T II, 39.)  Jessie told Moore that she was worried because, on the way out of the

courthouse, Defendant had looked at her and said, "I'm going to kill you for what you've done to me." (T II, 44, 52-53.)

Moore stayed with Jessie for about a half an hour in order to try to calm her down. (T II, 44.) She then told Jesse that she had kids at home so she had to leave, but that she would be back in fifteen (15) or twenty (20) minutes. (T II, 44, 58.) Jessie did not want Moore to leave. (T II, 58.) Jessie locked the door after Moore walked out. (T II, 44.) It was approximately 4:00 p.m. when Moore left Jessie's home. (T II, 44, 57.) The shades were open at that time. (T II, 45.)

Moore was unable to return to Jessie's home because Rex did not come home from work until 5:00. (T II, 59.) Moore became concerned after she received a telephone call from Yvonne Kowalak between 6:30 and 7:00 and Yvonne told her that Jessie was not answering her telephone. (T II, 45-46, 60, 62.) She told Rex that, "I'm going to check on mom (Jessie Kowalak), and I'll be back." (T II, 46.) Five (5) minutes later she arrived at Jessie's home. (T II, 46.) Jessie's car was not in the driveway. (T II, 46, 47-48.)

Moore knocked on the door, but Jessie did not answer. (T II, 48.) She tried to open the door, but it was locked. (T II, 48.) Moore noticed "a flickering form the T.V. being on . . ." and that there were no lights on in the home. (T II, 48.) Moore knew that Jessie did not watch television with the lights off. (T II, 48.)

Moore then went around the house trying to look through the windows. (T II, 48.) However, all of the shades were pulled down except for one that was up about half an inch up on the south side of the house. (T II, 48-49.) By looking through the window, Moore could see that Jessie was laying on the floor. (T II, 49.)

Moore, who wanted to get into the house to help Jessie, could not open any of the windows or doors, so she went to a neighbor's (Jeff Roop's) and called Rex to see if he had the key to get into Jessie's home. (T II, 49-50.) Rex indicated that he did have a key. (T II, 50.)

Moore and Roop then went back to the home and kept trying to open the windows. (T II, 50.) Finally, they were able to open the back south door of the home, which Jessie had "always locked" (but which was not locked at that time) and went into the home. (T II, 50-51, 56.) Moore saw Jessie lying on her left side and it appeared that "there was no life to her." (T II, 51, 67.) Moore called 9-1-1. (T II, 51, 67.)

The next witness to testify on behalf of the People was Jeffrey Roop. (T II, 74-75.) Roop testified that he lived next door to Jessie Kowalak. (T II, 75.) On the evening of February 24, 1993, Nancy Moore came over to his house and indicated that she was worried about Jessie because she would not answer the telephone or the door. (T II, 77, 81.) Eventually, Roop and Moore got into the house through a side door and went into the living room area of the home. (T II, 78.) Jessie "was kind of slumped out of a chair that she had apparently been sitting in, partially on the floor." (T II, 78, 82, 89.) Moore was markedly upset by what she saw. (T II, 78.) Roop and Moore laid Jessie on the floor on her back and checked her vital signs. (T II, 79, 83.) However, Roop could find no vital signs. (T II, 79.)

In the meantime, Moore made contact with a 9-1-1 operator, but had a

difficult time answering the questions posed to her. (T II, 79.) As such, Roop ended up talking to the 9-1-1 operator and told them that he was not getting any vital signs. (T II, 79).

The next witness to testify on behalf of the People was Jamie Krieger. (T II, 95-96.) Krieger lived across the street from Jessie Kowalak. (T II, 97.) Krieger testified that, between 5:00 p.m. and 6:00 p.m. on February 23, 1993, he saw Defendant go up to the front porch of the home wearing a snow cap. (T II, 98-99.) At that time, Jessie's car was parked in the driveway. (T II, 100.)

The next witness to testify on behalf of the People was Robert Omans. (T II, 100-102.) Omans worked with Defendant at the time of Jessie Kowalak's death. (T II, 102.)

On February 23, 1993, around 7:00 or 8:00 p.m., Defendant came over to Omans' home. Defendant was driving Jessie Kowalak's car (which he identified in People's Exhibit 7), which Omans had never seen Defendant drive previously. (T II, 103-104, 106.) Defendant had backed the car into Omans' driveway. (T II, 104.)

Omans let Defendant into the house. (T II, 104.) Omans and Defendant began talking and Defendant said, "Let's go get some beer." (T II, 104.) Omans and Defendant then got into the car and bought some beer at a party store. (T II, 104.) Defendant gave Omans $3.00 for the beer. (T II, 110.) They then returned to Omans' home. (T II, 105.) Defendant again backed into Omans' driveway. (T II, 108.)

Defendant asked Omans' girlfriend if she knew how to cut hair and trim beards. (T II, 107.) Eventually, Defendant stated, "Well, I'm going to get out of here." (T II, 107.) Omans testified that Defendant's hands had been scratched by his kitten five (5) or six (6) days prior. (T II, 108.)

The next witness to testify on behalf of the People was Rex Kowalak, Defendant's brother. (T II, 121.) Rex testified that he was a certified master mechanic in the State of Michigan and that he often worked on his mother's car. (T II, 123.) Rex testified that, on occasion, Jessie would allow Defendant to drive her car. (T II, 128.)

On February 24, 1993, Rex got home from work between 5:00 and 5:30. (T II, 125.) After he got home, Yvonne called the home and talked with Nancy Moore. (T II, 125-126.) Moore then left for Jessie's home. (T II, 126.) Shortly thereafter, Rex got a telephone call from Moore and left for his mother's home. (T II, 126.) He arrived at the home at the same time as a police vehicle and he and the officer went into the home together. (T II, 127.) Jessie was lying on the floor. (T II, 127.) Rex saw no signs of forced entry, sexual assault, or robbery in the house. (T II, 131.) He did notice that Jessie's car was missing from the driveway. (T II, 132.)

On cross-examination, Rex indicated that he very rarely spoke with Defendant and that it had been years since he had spoke with Defendant. (T II, 143.) On redirect examination, Rex stated that he and Defendant did not like each other and never had. (T II, 135.)

The next witness to testify on behalf of the People was Marjorie Bowman. (T II, 137.) Bowman testified that she had known Defendant for approximately

thirty (30) years.  (T II, 137.)  She indicated that she had dated Defendant.  (T II, 138.)

On February 24, 1993, Bowman lived in Hazel Park.  (T II, 138-139.)  At approximately 10:30 p.m., Bowman got a telephone call from Defendant.  (T II, 139.)  Defendant asked Bowman if he could come over to her house because he had some things he wanted to discuss with her.  (T II, 139.)

Defendant came over to Bowman's house and told her that his mother had testified in court that day.  (T II, 140.)  He told her that his mother had testified against him saying that he was alcoholic and that she did not feel that he would be responsible to take care of his children.  (T II, 140.)  Defendant then told Bowman that, when he got home, he found his mother laying on the floor.  (T II, 140.)  He told her that he "kind of freaked and left" the house with the car keys.  (T II, 141.)

Defendant then borrowed a few dollars from Bowman and went to the store and bought a half a pint of whiskey and some cigarettes.  (T II, 141.)  After he returned from the store, Defendant stated that, when he found his mother, he did not know whether she was dead or alive.  (T II, 141.)  He indicated that, if she was dead, they would most likely accuse him of her murder.  (T II, 141.)  When the police came to the door of Bowman's house at approximately 11:30 p.m., Defendant stated, "If that's the police, let them in."  (T II, 142, 147.)  On cross-examination, Bowman stated that Defendant had scratches on his hands "[a]ll the time" whenever he was "at his mother's house or anybody's house who had cats."  (T II, 150.)

The next witness to testify on behalf of the People was Lieutenant Robert Blickensdorf of the Madison Heights Police Department.  (T II, 154.)  On February 24, 1993, Lt. Blickensdorf went to Oakland General Hospital to begin investigating an "unattended death" in which foul play was suspected.  (T II, 155.)  He then proceeded to the victim's home at 26520 Dartmouth.  (T II, 156.)

Lt. Blickensdorf examined the home and found no signs of forced entry.  (T II, 158.)  He could also find no signs that the home had been ransacked, that there had been a struggle, or that the victim had been sexually assaulted.  (T II, 158-159, 170-171.)  He did notice that the victim's vehicle was missing.  (T II, 160.)

At approximately 11:30 p.m., the officers, assisted by officers from the Hazel Park Police Department, went to Marjorie Bowman's house in Hazel Park.  (T II, 11-162.)  Lt. Blickensdorf saw the victim's vehicle parked on the street, one house east of Bowman's home.  (T II, 161.)  They knocked on the door of the home and Bowman answered.  (T II, 162.)  Defendant was arrested in the residence just prior to midnight.  (T II, 162, 173.)

Defendant was taken to the police station.  (T II, 162.)  At the station, Lt. Blickensdorf noticed numerous scratches on the outside of Defendant's hands.  (T II, 163.)

Lt. Blickensdorf attended the autopsy on Jessie Kowalak on February 25, 1993.  (T II, 167.)  He was present when Jessie's fingernails were removed (clipped) and packaged.  (T II, 168, 169.)  They were given to Lt. Blickensdorf who transported them to the Michigan State Crime Laboratory in the City of Sterling Heights and gave them to laboratory specialist David Woodford.  (T II, 168.)

The next witness to testify on behalf of the People was David Woodford, a laboratory scientist with the Michigan State Crime Laboratory in the City of Sterling Heights. (T II, 175.) He testified that his specialty was forensic serology (analysis of body fluids). (T II, 175.) Woodford was qualified as an expert in the field of forensic serology without objection. (T II, 177.) On February 26, 1993, Woodford tested the fingernail clippings from Jessie Kowalak and found that two (2) clippings (one from each hand) had a minute amount of blood on them. (T II, 179-180, 186.)

Woodford then tried to determine if the blood was human. (T II, 180-181.) However, there was not enough blood to be able to determine whether or not it was human in nature. (T II, 181, 188.)

The next witness to testify on behalf of the People was Dr. Kanu Virani, Deputy Chief Medical Examiner of Oakland County. (Transcript 3-18-97, hereinafter T III, 6.) Dr. Virani was qualified as an expert in the field of forensic pathology without objection. (T III, 9.)

On February 25, 1993, Dr. Virani performed an autopsy on the body of Jessie Kowalak. (T III, 11, 65, 80.) Jessie was eighty-two (82) years old. (T III, 11.) Dr. Virani began with an external examination. (T III, 12.) He found that Jessie had injuries on her nose, around the lip and mouth area, and under the chin. (T III, 13.) Abrasions were present on the nose, lips, inside of the lip, on the tongue, and under the chin. (T III, 13.) Dr. Virani testified that abrasions occur when there is a scraping of the skin. (T III, 17-18, 60.)

Dr. Virani also testified that there were pinpoint hemorrhages in Jessie's eyelids and upper eyelids. (T III, 19.) He indicated that "[w]ith the combination of those pinpoint hemorrhages, the injury on the nose and the lips, under the chin, that all becomes a combination of an – what is known as 'asphyxia;' particular one is the smothering."[2] (T III, 20.) He defined "smothering" as "keeping the nose and mouth closed so that [a] person cannot breath." (T III, 20.) Dr. Virani testified that, based on what he saw, it was "obvious" that Jessie Kowalak had been smothered. (T III, 20.)

[2]Dr. Virani noted on cross-examination that pinpoint hemorrhages can be caused by means other than smothering. (T III, 74.)

Dr. Virani testified that he also performed an internal examination of Jessie Kowalak's body. (T III, 21-22.) He did not find any internal injuries and noted that her heart was "in better shape than her 82-year-old age." (T III, 22, 69-70.) Dr. Virani noted that "[h]er lungs were slightly filled with fluid which is known as edema of the lungs, or swelling of the lungs, which is common in a smothering or any asphyxia." (T III, 22, 103.)

Dr. Virani testified that it was his expert opinion that the cause of Jessie Kowalak's death was smothering. (T III, 23.) He stated that "it was probably a human hand that was kept on the nose, mouth and chin area so that she cannot open her mouth – and the nose was broke – so that she cannot breathe." (T III, 24.) Dr. Virani testified that it would take about two (2) or three (3) minutes for someone

11

subjected to suffocation to become unconscious and die. (T III, 25.) He testified that he believed the manner of death to be homicide. (T III, 26.)

When shown photographs of the scratches on Defendant's hands, Dr. Virani testified that the abrasions "are more likely from a human nails [sic] than anything otherwise" because of the curvature of the nail. (T III, 28, 82.) He noted that the scratches in the photographs appeared to be twenty-four (24) hours old and could not be more than approximately forty-eight hours old. (T III, 84; Transcript 3-20-97, hereinafter T IV, 10-11.)

With Dr. Virani's testimony, the People rested. (T IV, 11.) The first witness called to the stand by the defense was Gaylen Curtis. (T IV, 12.)

Curtis testified that she represented Yvonne Kowalak in various courts from 1989 to 1993. (T IV, 13.) Curtis stated that she was representing Yvonne during the hearing that took place on February 24, 1993, before Judge Howard. (T IV, 13.) During that hearing, Jessie Kowalak briefly testified. (T IV, 13-14.)

Curtis testified that, when the hearing was over, she, Yvonne, and Jessie left the courtroom and paused outside the courtroom in the hallway. (T IV, 13.) Eventually, they walked to the elevators at the end of the hallway. (T IV, 14.) Curtis testified that, it was at this point that they "passed" Defendant. (T IV, 14.) Curtis testified that she "segregated" Yvonne and Jessie and suggested that they wait for another elevator. (T IV, 15, 22.) She recalled no discussion between the individuals. (T IV, 15.)

Curtis testified that they got off the elevator on the first floor. (T IV, 16.) When asked if she saw defendant again, either on the first floor or outside, Curtis responded, "I don't recall. He may have passed us again. He may not have. I do not recall." (T IV, 16-17.) She did not recall where she ultimately left Yvonne and Jessie. (T IV, 27, 29.)

The defense then recalled Lt. Blickensdorf to the stand. (T IV, 31.) Lt. Blickensdorf testified that the photographs of Defendant's hands that had been shown to Dr. Virani were taken on February 28, 1993. (T IV, 31-32.)

The next witness called to the stand by the defense was Officer Glen Fearn, formerly of the Madison Heights Police Department. (T IV, 33-34.) Fearn testified that he tried calling Jessie Kowalak's home on February 24 and got a busy signal. (T IV, 36-37, 38.) A few minutes later, Fearn tried to call the home again and no one answered. (T IV, 37, 39.)

The defense then recalled David Woodford to the stand. (T IV, 43.) Woodford testified that the blood found on the fingernails was on the inside of the nails. (T IV, 44-45, 51.)

After recalling Majorie Bowman to the stand (T IV, 63-64), Defendant took the stand on his own behalf. (T IV, 68-69.) Defendant testified that he and Yvonne were married on July 22, 1981, and were divorced in October of 1989. (T IV, 69.)

Defendant testified that he was in court on February 24, 1993, for a visitation review hearing and had gotten to court by bus. (T IV, 78-80.) He indicated that he was representing himself because he could not afford an attorney. (T IV, 79).

Defendant testified that, at the conclusion of the hearing, he left the

courtroom through a different door than Yvonne, her attorney, and his mother had used. (T IV, 82.) Defendant stated that he always made a point of avoiding Yvonne "[b]ecause she was in the habit of creating incidents, and I didn't want to have to deal with that." (T IV, 83.)

Defendant stated that he left the courtroom and went down the "private hallway" and then waited for an elevator. (T IV, 83.) Defendant indicated that, as he was waiting for an elevator, he saw Yvonne, her attorney, and his mother, pass him and go down the stairs. (T IV, 84, 138-139.) According to Defendant, no communication occurred. (T IV, 84.)

Defendant testified that he then took an elevator to the first floor. (T IV, 84) At that point, according to Defendant, he realized that he was on the wrong floor to catch the bus. (T IV, 85.) Defendant testified that, because he had around half an hour wait for the bus, he decided to go outside on the first floor to smoke a cigarette. (T IV, 85.)

Defendant testified that, just as he was finishing his cigarette, he looked into the lobby area and saw his mother, Yvonne, and her attorney, speaking to two (2) deputy sheriffs in the lobby. (T IV, 86.) Defendant indicated that they were looking at him and he assumed that Yvonne was going to try to create another incident. (T IV, 86.)

Defendant testified that, as his mother, Yvonne, and her attorney, walked out of the building, he turned his back to them. (T IV, 87.) According to Defendant, when he turned around again, he could not see his mother or Yvonne, but could see Gaylen Curtis walking through the parking lot. (T IV, 87.) Defendant denied that he had said anything to any of them as they walked past him. (T IV, 87.)

Defendant testified that he went back into the building, went to the ground floor, and exited the courthouse where he caught a bus that took him to downtown Pontiac. (T IV, 88.) He further testified that he transferred to another bus which took him to Royal Oak by approximately 4:20. (T IV, 88-89.) Defendant stated that he took another bus to Eleven Mile Road and Campbell and had to walk to his mother's house from there. (T IV, 89.)

Defendant testified that he arrived at his mother's home at approximately 5:15. (T IV, 89, 139.) He indicated that he went in the home through the front door which was unlocked because "[m]y mother always left the front door unlocked for me." (T IV, 90.)

Defendant stated that, when he walked in, he saw that his mother "was on the floor in front of her chair that she normally sits in." (T IV, 90.) Defendant testified that he crossed over his mother and knelt down and "it was obvious to me at that point that my mother was dead." (T IV, 93.) Defendant stated that he assumed that his mother had died from a heart attack or possibly a stroke. (T IV, 95, 141.) He admitted that he did not check her vital signs, or call 9-1-1 or the police. (T IV, 140-141.)

Defendant testified that he did not call the police because of animosity between himself and the Madison Heights Police Department. (T IV, 95.) He felt that they would accuse him of something because "I've been accused of everything

13

you can think of by the Madison Heights Police." (T IV, 95.)

Defendant testified that he took his mother's keys and left the house through the back door. (T IV, 94, 142.) He further testified that he took his mother's car and drove, eventually ending up at a Hardee's restaurant at Eleven Mile Road and I-75, where he stayed for at least an hour. (T IV, 94.)

Defendant testified that he left Hardee's and went past the house of his friend, John McMann. (T IV, 98.) According to Defendant, McMann was not home so he started to drive back to Hardee's, when he recalled that Brenda Holmes lived on the same street as McMann. (T IV, 99, 143.) As such, he drove to see Bob Omans, who lived with Holmes. (T IV, 99, 100.) Defendant stated that, when got to the home, he backed into the driveway, which was his customary manner of parking. (T IV, 100.) Omans answered the door. (T IV, 143.)

Defendant stated that he talked with Omans and Holmes for two (2) or three (3) hours. (T IV, 99.) Defendant testified that he did not tell them about his mother because he was not that "familiar" with them. (T IV, 100.)

Defendant testified that he had been to the home four (4) or five (5) days earlier, at which time he had been repeatedly scratched by a kitten. (T IV, 101.) He added that he was also scratched by the kitten when he was at the home on February 24, 1993, "but it wasn't anything like the time previous." (T IV, 101.)

Defendant testified that, while at the home, he and Omans left to get some beer. (T IV, 146.) Defendant stated that, when he got back to the house, he drank one (1) beer. (T IV, 146.) Defendant denied that he had asked Holmes that evening to cut his hair that night. (T IV, 147.)

Defendant testified that, when he left the home (at approximately 10:00 p.m.), he went to Marjorie Bowman's house, which was about a mile away. (T IV, 103, 147.) According to Defendant, he knocked on her door, but no one answered. (T IV, 103.) Defendant testified that he drove to a nearby pay phone and called Bowman. (T IV, 103.) Bowman answered the phone and told Defendant that she had been doing the laundry. (T IV, 104.) According to Defendant, he told Bowman, "Well, listen, I need to come over. I know it's late, but I need to talk to you." (T IV, 104.)

Defendant testified that he then went back to Bowman's house. (T IV, 104.) He borrowed $2.00 from her and went to the store to buy half a pint of whiskey because his "nerves were shot." (T IV, 105, 148.)

Defendant testified that he returned from the store and "immediately" drank some of the whiskey. (T IV, 105.) According to Defendant, he then talked to Bowman about the court hearing. (T IV, 105.) Defendant testified that he then told Bowman about finding his mother and that she reacted by saying, "You are going to jail. You know you have to call the police, and as soon as you do, you will go to jail." (T IV, 106.) Defendant testified that he did not have the opportunity to call the police because the police arrived at Bowman's house. (T IV, 106.)

On cross-examination, the following colloquy occurred regarding a statement made by Defendant to the Madison Heights Police:

Q    Does that (indicating) refresh your memory as to what you told the Madison Heights Police?

14

A     Yes.

Q     What did you say?

A     You're asking me to quote that (indicating) statement?

Q     Yeah.

A     Are you asking me to quote this (indicating)?

Q     Yes.

A     I think what – I'll try to get it exactly right.  "Okay, you're looking for a motive.  It's been there since I was eight years old."  Something like that.
(T IV, 153.)

With Defendant's testimony, the defense rested.  (T IV, 157.)  The People called Rex Kowalak as a rebuttal witness.  (T IV, 157.)  Rex testified that there was no animosity between Nancy Moore and his mother.  (T IV, 158.)  With Rex Kowalak's testimony, the People again rested.  (T IV, 160.)

Appellee's Br., in *People v. Kowalak*, No. 203164 (Mich. Ct. App.), at 9-27.

C.    *Procedural Default*

Respondent first contends that all but petitioner's speedy trial claim are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263.  Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim."  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must

15

be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

While the procedural default doctrine precludes habeas relief on a defaulted claim, the procedural default doctrine is not jurisdictional. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). Thus, while the procedural default issue should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); *see also*, *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Walter v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995). Here, several factors counsel in favor of considering petitioner's claims on the merits rather than relying on the procedural default doctrine.

Petitioner first presented his purportedly defaulted habeas claims in his motion for relief from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* MICH. CT. R. 6.508(D)(1)-(3). The Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under

MCR 6.508(D)."  However, the Sixth Circuit has issued somewhat conflicting decisions regarding the extent to which this language, standing alone, is sufficient to invoke the procedural bar of Rule 6.508(D)(3).  *Compare Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000) (language alone sufficient to constitute invocation of procedural bar), *with Abela v. Martin*, 380 F.3d 915, 923-24 (6th Cir. 2004) (language insufficient where lower court opinion rejected claims on the merits).

Second, in rejecting petitioner's appeals on the first motion for relief from judgment–the one which the trial court did not permit petitioner to file–neither the Michigan Court of Appeals nor the Michigan Supreme Court purported to rely on a procedural bar.  On the contrary, the Michigan Court of Appeals expressly denied leave to appeal "for lack of merit in the grounds presented." *People v. Kowalak*, No. 243592 (Mich. Ct. App. May 5, 2003).  Petitioner's appeal raised not only the claim that the trial court had erred in rejecting his motion for relief from judgment, but also the substantive claims for relief.  Thus, it is not clear that these claims should properly be considered defaulted.  Further, when the matter was again presented to the trial court in petitioner's second motion for relief from judgment, the court rejected all but one of the claims on the grounds that they had been previously presented on appeal and thus were barred by Rule 6.508(D)(2).  *See People v. Kowalak*, No. 93-123822-FC, at 3 (Oakland County, Mich., Cir. Ct. July 27, 2005).  Rule 6.508(D)(2) is a collateral estoppel rule which prohibits a trial court from reconsidering a claim already decided against a defendant on direct appeal.   Application of this collateral estoppel rule does not bar federal habeas review.  As this Court has explained: "Rule 6.508(D)(2) is simply a *res judicata* rule barring a defendant from relitigating claims in a motion for relief from judgment which were decided adversely to him in a prior state court decision.  Because Petitioner's . . . claims were considered on the merits in Petitioner's [direct appeal], there is no bar to habeas review of these

17

claims." *Morse v. Trippett*, 102 F. Supp. 2d 392, 402 (E.D. Mich. 2000) (Tarnow, J.) (citing *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996); *Silverstein v. Henderson*, 706 F.2d 361, 368 (2d Cir. 1983)); *accord Correll v. Thompson*, 63 F.3d 1279, 1289 n.8 (4th Cir. 1995).

In light of the somewhat conflicting analyses set forth by the Sixth Circuit in *Simpson* and *Abela*, and the difficulty in this case determining upon exactly what bases the Michigan courts rejected petitioner's claims, the procedural default analysis is significantly more complicated than the analysis of petitioner's substantive claims for relief. Because, as explained below, those claims are without merit, the Court should deny the petition on that basis rather than on the basis of an purported procedural default.

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

18

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529

19

U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.     *Actual Innocence/Sufficiency of the Evidence (Claim I)*

In his first claim, petitioner contends that he is actually innocent of the crime and that the prosecution presented insufficient evidence of his guilt. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Actual Innocence*

To the extent that petitioner is asserting an independent claim that he is actually innocent, the claim is not cognizable on habeas review. A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, the existence of new evidence, standing alone, is not a basis for granting the writ. As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief

absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id*. at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). Thus petitioner's claim of innocence, standing alone, provides no basis for habeas relief.

Further, even if such a claim were cognizable on habeas review, petitioner has presented no evidence of actual innocence. To establish actual innocence as an exception to a procedural bar, a petitioner must present "new and reliable evidence that was not presented at trial" that "show[s] that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 299 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327 (internal citation and quotation omitted). It is not sufficient to show merely that the evidence raises a reasonable doubt which did not otherwise exist. *See id*. at 329 ("The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."). "Examples of evidence which may establish factual

21

innocence include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence"); *House v. Bell*, 547 U.S. 518, 537 (2006) (same). Here, as explained below, the prosecution presented sufficient evidence to sustain petitioner's conviction, and he has presented no new evidence, much less new reliable evidence, tending to demonstrate that he is actually innocent of the crime for which he was convicted. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Sufficiency of the Evidence*

Petitioner also contends that the evidence was insufficient to prove his guilt beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

a.  *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In

22

determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

### b. Analysis

Petitioner does not challenge the sufficiency of the evidence with respect to any particular element of the charge against him. Rather, he contends that the evidence was insufficient to establish his identity as the perpetrator. In support of this claim, petitioner points to a number of supposed inconsistencies in the testimonies of the witnesses, and constructs scenarios in which either Moore murdered the victim or the victim dies as the result of an accident. Petitioner also contends that much of the evidence admitted against him was inadmissible, and that without this evidence there was insufficient evidence to convict. The Court should conclude that petitioner is not entitled

to habeas relief on this claim.

Here, there was sufficient evidence presented to establish petitioner's identity as the perpetrator. Moore testified that the victim told her that petitioner had threatened the victim after the court hearing. There were no signs of forced entry, suggesting that someone known to the victim entered her home and killed her. The medical examiner testified that the victim died from asphyxiation, and that the mode of death was homicide. The evidence suggested that petitioner had both motive and opportunity to commit the crime. Further, petitioner's own testimony that he was at the house placed him at the scene of the murder, and his testimony that he saw his mother lying on the floor but simply left without attempting to help her or obtain emergency assistance was inconsistent with his claim of innocence. Drawing all inferences in favor the prosecution this evidence, if believed by the jury was sufficient to establish beyond a reasonable doubt that petitioner was the perpetrator.

Petitioner's litany of supposed inconsistencies and arguments attacking the credibility of certain testimony does not alter this result. It is well-established that a reviewing court, whether on direct appeal or habeas review, "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *Walker v. Russell*, 57 F.2d 472, 475-76 (6th Cir. 1995); *see also*, *United States v. Bailey*, 444 U.S. 394, 414-15 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations." *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court

24

must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996). Nor do petitioner's various explanations for how the victim may have died alter this result. The fact that the evidence may have supported another version of events is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326.

Finally, petitioner's argument that various items of evidence were inadmissible does not affect the Court's analysis of his sufficiency of the evidence claim. Even assuming that some evidence was improperly admitted, this would not entitle petitioner to habeas relief based on the sufficiency of the evidence. While the erroneous admission of evidence may, or may not, entitle a habeas petitioner or appellant to relief on that basis, in assessing the sufficiency of the evidence the Court is required to weigh all of the evidence, even that evidence which was improperly admitted. *See United States v. Carneglia*, 47 Fed. Appx. 27, 34-35 (2d Cir. 2002); *United States v. Castaneda*, 16 F.3d 1504, 1510 (9th Cir. 1994); *cf. Lockhart v. Nelson*, 488 U.S. 33, 38-39 (1988) (in assessing whether the evidence was sufficient for purposes of determining whether retrial is permitted under the Double Jeopardy Clause, court looks at all of the evidence admitted, even that which was improperly admitted). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his sufficiency of the evidence claim.

F.    *Evidentiary Claims (Claims IV-VI)*

Petitioner next raises several claim relating the evidence admitted at trial. In Claim IV, he contends that the court improperly admitted the hearsay statements of the victim through the testimony of Nancy Moore. In Claim V, he contends that the scientific evidence was unreliable and should not have been admitted. Finally, in Claim VI he contends that the trial court erred in

25

excluding defense evidence on hearsay grounds.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

      1.    *Evidentiary Claims Generally*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws.").  Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution."  *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy."  *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also, Coleman v.*

*Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right

to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only

if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and

the adversary system will not be competent to uncover, recognize, and take due account of its

shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

> 2.      *Hearsay Evidence and Confrontation (Claim IV)*

Petitioner contends that the trial court erred in admitting the testimony of Nancy Moore

regarding the hearsay statements made to her by the victim, petitioner's mother.  The Court should

conclude that petitioner is not entitled to habeas relief on this claim.

> *a. Background Relating to Moore's Testimony*

At trial, Moore testified that she spoke with the victim by telephone on February 23, 1993,

at 3:30, after the victim had come home from the court hearing.  *See* Trial Tr., Vol. II, at 34, 56.

Moore testified that the victim  was "petrified" and "scared to death."  *See id.* at 36, 38.  Moore

immediately went over to the victim's house, and the victim let her in and immediately locked the

door.  *See id.* at 38-39.  The victim told Moore that she was worried because, on the way out of the

courthouse, Defendant had looked at her and said, "I'm going to kill you for what you've done to

me."  *See id.* at 44, 52-53.

Prior to trial, Moore had testified at the preliminary examination essentially as she testified

at trial.  *See* Prelim. Exam. Tr., at 20-36.  Petitioner filed a motion to suppress this testimony on

hearsay grounds.  The trial judge denied this motion, concluding that the hearsay testimony was

admissible as both an excited utterance under Rule 803(2) and as a statement reflecting the victim's

then-existing state of mind under Rule 803(3).  Petitioner filed an interlocutory appeal, challenging

these conclusions as well as arguing that his statement to his mother constituted hearsay within hearsay. The court of appeals rejected this latter argument, concluding that petitioner's statements to his mother were not hearsay at all because it was the statement of a party under Rule 801(d)(2). *See Kowalak*, 215 Mich. App. at 556-57, 546 N.W.2d at 682. Turning to Moore's testimony regarding the victim's statement to her, the court of appeals concluded that the testimony was hearsay, but that it was admissible under the excited utterance exception. The court explained that, for a statement to be admissible under this exception, three criteria must be met: "First, the statement must arise out of a startling event; second, it must be made before there has been time for contrivance or misrepresentation by the declarant; and third, it must relate to the circumstances of the startling event." *Id.* at 557, 546 N.W.2d at 683. Applying these three factors, the court of appeals concluded that the statement was admissible as an excited utterance. First, the court reasoned, "[i]t is hard to conceive of a more startling (or terrifying) event with which one might be confronted than a serious death threat. This is especially true when such a death threat has been made by one's own son." *Id.* at 558, 546 N.W.2d at 683. Second, the court reasoned that although 35-40 minutes elapsed between the time of the threat and the victim's call to Moore, the statement was made while the victim was still under the influence of the startling event, and thus was made before there was time for contrivance or misrepresentation. *See id.* at 558-59, 546 N.W.2d at 683. Finally, the court rejected petitioner's argument that there was insufficient independent proof of the startling event to permit admission of the excited utterance. The court explained that although there was no direct proof of the startling event, circumstantial evidence supported the existence of the startling event, including that circumstances of the visitation hearing at which the victim testified, the victim's emotional state, and Moore's going to the victim's home shortly after the phone call.

28

*See id.* at 559, 546 N.W.2d at 684.

### b. Admission of Hearsay Evidence

To the extent that petitioner's claim is based on the state courts' application of the excited utterance rule, his claim is not cognizable. As noted above, errors in state evidentiary law do not provide a basis for federal habeas relief. The Michigan Court of Appeals concluded that the evidence was admissible as an excited utterance under Rule 803(2), and this conclusion of state law is not subject to attack in a federal habeas proceeding. Further, petitioner's challenge to the admission of the evidence primarily attacks the credibility of Moore's testimony. However, whether Moore's testimony regarding the victim's statement was credible went to the weight of the evidence to be accorded by the jury, not to its admissibility under Rule 803(2). Thus, petitioner is not entitled to habeas relief to the extent that his claim is based on the state courts' application of Rule 803(2).

### c. Confrontation Clause

To the extent that petitioner claims the admission of the victim's hearsay statement to Moore violated his confrontation rights, the claim is without merit.

The Sixth Amendment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is applicable to the states through the Fourteenth Amendment's Due Process Clause. *See Pointer v. Texas*, 480 U.S. 400, 406 (1965). At the time of petitioner's trial and appeal of right, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings. Thus,

the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66. As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception. The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability." *Idaho v. Wright*, 497 U.S. 805, 821 (1990). Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection." *Roberts*, 448 U.S. at 66 (internal quotation omitted).

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements. After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause. *See id*. at 60-68. The Court therefore abrogated *Roberts* as applied to testimonial hearsay

30

statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 68-69. In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. The Court did, however, provide some guidance. Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52 (internal quotations and citations omitted). While the Court declined to adopt any of these three formulations, the Court noted that the term "testimonial," whatever else it may cover, "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68.

*Crawford* establishes a confrontation rule with respect to "testimonial" statements; it has no application to non-testimonial hearsay. The question therefore remains whether *Roberts* has any applicability to this case to the extent that the statements admitted at petitioner's trial were not testimonial hearsay under *Crawford*. Because it is now clear that the Confrontation Clause is not at all concerned with non-testimonial hearsay, the Court should conclude that *Roberts* has no application here.

In *Crawford*, the Court suggested, but did not definitively rule, that the Confrontation Clause is limited to regulating the introduction of testimonial hearsay, and has no application at all to the

31

admission at trial of non-testimonial hearsay.  The Court explained that "[w]here nontestimonial

hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility

in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all

such statements from Confrontation Clause scrutiny altogether."  *Crawford*, 541 U.S. at 68.

Immediately following *Crawford*, the Courts concluded that *Roberts* remained applicable to non-

testimonial hearsay, observing:

> [t]he lynchpin of the *Crawford* decision thus is its distinction  between testimonial
> and nontestimonial hearsay; simply put, the rule announced in *Crawford* applies only
> to the former category of statements. . . . [U]nless a particular hearsay statement
> qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005); *see also*, *Horton v. Allen*, 370 F.3d

75, 83-84 (1st Cir. 2004); *United States v. Johnson*, 354 F. Supp. 2d 939, 964 (N.D. Iowa 2005);

*United States v. Savoca*, 335 F. Supp. 2d 385, 391-92 (S.D.N.Y. 2004).  Regardless of whether this

reading of the *Crawford* dictum was correct, the Supreme Court has since clarified that the

Confrontation Clause is simply not implicated by the introduction of non-testimonial hearsay.  In

*Davis v. Washington*, 547 U.S. 813 (2006), the Court explicitly addressed this question of "whether

the Confrontation Clause applies only to testimonial hearsay," *id*. at 823, and in doing so abrogated

*Roberts* in whole.  The Court noted that the answer to this question was suggested in *Crawford*,

when the *Crawford* decision explained that the Confrontation Clause focuses on "witnesses" who

give "testimony." *Id*. at 823-24 (discussing *Crawford*, 541 U.S. at 51).  The *Davis* Court explained

that "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said

to mark out not merely its 'core,' but its perimeter." *Id*. at 824 Thus, where nontestimonial hearsay

is at issue, the Confrontation Clause is not implicated at all, and need not be considered.  *See*

*Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Roberts*, an out-of-court nontestimonial

statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability.  Under *Crawford*, on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."); *United States v. Pugh*, 273 Fed. Appx. 449, 454 (6th Cir. 2008); *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

This conclusion is not altered by the fact that *Roberts* was clearly established federal law at the time the Michigan Court of Appeals decided petitioner's case.  The jurisdiction of a federal court to issue a writ of habeas corpus is provided by § 2254(a), which grants jurisdiction to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Section 2254(d) merely delineates a subset of these case in which habeas relief is not available.  Thus, a finding under § 2254(d)(1) that the state court unreasonably applied *Roberts* would not automatically entitle petitioner to habeas relief if the admission of the evidence were nonetheless constitutional.  As the Fourth Circuit has explained,

> [n]either *Williams* nor § 2254(d)(1) requires issuance of a writ before determining the critical question of whether a prisoner is being held in violation of the Constitution or laws of the United States. Thus, the proper interpretation of the role of § 2254(d)(1) in habeas corpus review is that it establishes a threshold by which we determine whether we are authorized to issue a writ, but it does not compel the issuance of a writ once the standard set forth therein has been satisfied. *See [Williams*, 529 U.S.] at 412 (deeming § 2254(d)(1) a "new constraint" on federal courts' power to issue writs and stating that a federal court "may" issue the writ upon determining that the standards found in § 2254(d)(1) are satisfied); *see also Weeks v. Angelone*, 528 U.S. 225, 237 (2000) (referring to the issue under § 2254(d)(1) as whether habeas relief is "preclude[d]" or "prohibit[ed]," rather than whether such relief is mandated). Rather, § 2254(d)(1) must be read in conjunction with the purpose of the writ, as outlined in § 2254(a), which is to protect a prisoner from being held in violation of federal law.

*Rose v. Lee*, 252 F.3d 676, 691 (4th Cir. 2001) (parallel citations omitted).  In other words, even

33

where a state court decision is unreasonable under § 2254(d)(1), "a prisoner must establish an entitlement to the relief he seeks" under § 2254(a) by demonstrating that he is being held in violation of the Constitution or laws of the United States. *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003); *see also*, *Palmer v. Clark*, 408 F.3d 423, 436 (8th Cir. 2005) ("Even if the [state] court erred in its analysis, [petitioner] is not entitled to relief on this ground unless his constitutional or statutory rights were violated."). Thus, if the hearsay evidence admitted at petitioner's trial was not testimonial under *Crawford*, then petitioner cannot establish a constitutional violation under § 2254(a) and he is not entitled to habeas relief, regardless of whether the admission of the evidence comported with *Roberts*.[1]

Turning to that issue, it is clear that the victim's hearsay statement to Moore regarding the threat that petitioner had made was not testimonial hearsay under *Crawford*. The language of the *Horton* decision, which found *Crawford* inapplicable to the introduction of evidence under the state of mind exception to the hearsay rule, is directly applicable here:

> In light of these formulations, [the victim's] statement[] do[es] not qualify as testimonial. [It was] not ex-parte in-court testimony or its equivalent; [was] not contained in formalized documents such as affidavits, depositions, or prior testimony transcripts, and [was] not made as part of a confession resulting from custodial examination. Rather, [the victim's] statement[] [was] made during a private conversation with [Moore]. In short, [the victim] did not make the statement[] under circumstances in which an objective person would "reasonably believe that the statement would be available for use at a later trial." Because [the victim's] statement[] [was] not testimonial, [its] admission is outside of *Crawford*'s scope.

---

[1] Although this result flows from a plain reading of § 2254, the conclusion is buttressed by the absurdity of a contrary result. For instance, suppose that the Court were to conclude that the Michigan Court of Appeals unreasonably applied *Roberts* with respect to a particular non-testimonial statement, and that this finding alone entitled petitioner to habeas relief. The actual relief to which petitioner would be entitled would be a new trial. However, at that new trial, the prosecution would be free to again introduce the non-testimonial statement, because under *Crawford* and *Davis* it is clear that the non-testimonial statement is not barred by the Confrontation Clause.

34

*Horton*, 370 F.3d at 84 (internal citation omitted).  Thus, the victim's hearsay statements to Moore were not testimonial.  *See Doan v. Carter*, 548 F.3d 449, 458 (6th Cir. 2008) (victim's statements to family and friends regarding abuse she had received at hands of petitioner not testimonial); *United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (citing cases) (casual statements to family and acquaintances nontestimonial under *Crawford*).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.[2]

     3.    *Scientific Evidence (Claim V)*

     Petitioner next contends that he was denied a fair trial by the introduction of unreliable scientific evidence.  In large part, petitioner's argument focuses on evidence which the prosecution at one point sought or attempted to present, but which was not actually presented at trial.  Of course, petitioner could not have been denied a fair trial by unreliable scientific evidence that was not introduced at trial.  With respect to the evidence which was introduced at trial, petitioner challenges Woodford's testimony that blood was found under the victim's fingernails, and Dr. Vironi's testimony that at least some of the scratches on his hand were caused by human nails rather than cat claws.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

     This general rule regarding the limited cognizability of evidentiary claims on federal habeas review applies equally to claims based on the allegedly improper admission of scientific evidence.  *See, e.g.*, *Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998); *Spencer v. Murray*, 18 F.3d 237, 239

---

[2]Although *Roberts* as no applicability here, even if *Roberts* were relevant the same conclusion would hold.  As noted above, under *Roberts* a hearsay statement may be admitted without violating the Confrontation Clause if the declarant is unavailable and the statement bears adequate indicia of reliability, and reliability is presumed if the statement is admitted pursuant to a firmly rooted hearsay exception.  *See Robert*, 448 U.S. at 66.  Here, the victim was clearly unavailable, and her statement was admitted pursuant to the excited utterance exception.  It is well established that the excited utterance exception is a firmly rooted hearsay exception for purposes of the Confrontation Clause.  *See White v. Illinois*, 502 U.S. 346, 355 n.8 (1992).

(4th Cir. 1994); *Arnold v. Wyrick*, 646 F.2d 1225, 1228 (8th Cir. 1981); *Albanese v. McGinnis*, 823 F. Supp. 521, 553 (N.D. Ill. 1993). As noted above, the question is not whether the admission of this evidence was improper under the rules governing scientific evidence, or whether the evidence was inadmissible on some other state law basis. *See Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994). Rather, the only issue for this Court on habeas review is whether the admission of the evidence denied defendant a fair trial; that is, whether the evidence was "almost totally unreliable" such that "the factfinder and the adversary system w[ould] not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983). The Court should conclude that petitioner has failed to meet this burden.

Both Woodford and Dr. Vironi were subject to extensive cross-examination regarding the bases of their opinions. Woodford testified that the substance found was blood, but that it could not be determined whether the blood was human or animal, and no DNA testing could be done. Dr. Vironi admitted on cross-examination that his conclusion regarding the source of the scratches on petitioner's hands was not based on any scientific testing or protocol, but on his experience and review of the photographs. Although petitioner quarrels with the conclusions reached by these witnesses, he does not point to any inherently flawed scientific methodology upon which the opinions were based, nor point to any other fact which rendered cross-examination and contrary evidence insufficient to uncover the shortcomings of the testimony. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

4.      *Exclusion of Hearsay Evidence and Right to Present a Defense (Claim VI)*

Petitioner next contends that he was denied his constitutional right to present a defense when the trial court prohibited him from eliciting testimony from Bowman regarding a conversation

between Bowman and Moore on February 17.  Petitioner argues that evidence of this conversation would have impeached Moore's testimony.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a.  Clearly Established Law

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law.  Implicit in these provisions is the right to present a meaningful defense.  As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right to present a defense is fundamental, it is not absolute.  Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

To constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court). In other words, application of the rules of evidence constitute a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

### b. Analysis

On cross-examination, defense counsel elicited from Marjorie Bowman that she had spoken to Nancy Moore on February 17, the date originally scheduled for the child custody hearing. However, the court sustained the prosecutor's hearsay objection to the substance of that conversation. *See* Trial Tr., Vol. II, at 143-46. Counsel recalled Bowman during the presentation of his case, again attempting to elicit from Bowman the substance of the conversation, in particular, whether Moore wanted to know petitioner's whereabouts on that day. The trial court again sustained the prosecutor's objection. *See id.*, Vol. IV, at 63-68. Petitioner contends that this testimony would have shown that Moore was attempting to track petitioner's movements, leading Moore to wrongly

38

believe that he would arrive at the victim's house at about 7:00 p.m. on the day of the murder.

There is no doubt that petitioner's right to present a defense does not relieve him from his obligation to comply with the rules of evidence, *see Clark v. Arizona*, 126 S. Ct. 2709, 2731-32 (2006); *Scheffer*, 523 U.S. at 308. It is true that the Court has held that state hearsay rules may not be applied mechanistically so as to prevent a defendant from presenting evidence fundamental to his defense. *See Chambers*, 410 U.S. at 302, 313. However, *Chambers* and its progeny "do not stand for the proposition that a petitioner's due process rights are violated any time a state court excludes evidence that the petitioner believes is the centerpiece of his defense. Instead, the cases . . . stand for the more limited proposition that a defendant's due process rights are violated when a state court excludes important evidence on the basis of an arbitrary, mechanistic, or per se rule, or one that is disproportionate to the purposes it is designed to serve." *Alley v. Bell*, 307 F.3d 380, 394 (6th Cir. 2002). In other words, application of the rules of evidence constitutes a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

Here, despite his argument to the contrary, petitioner cannot show that the exclusion of Bowman's testimony undermined a fundamental aspect of his defense. Petitioner contends that the exclusion of the testimony prevented him from impeaching Moore's testimony that she did not know Bowman and had never spoken with her. However, petitioner was permitted to introduce into evidence the fact of the February 17 phone call, and this fact impeached Moore's testimony regardless of the contents of that phone call. Bowman's testimony regarding the contents of the phone call was relevant only to petitioner's claim that Moore herself killed the victim and framed

petitioner.  However, the theory that Moore was the killer was not a fundamental element of petitioner's defense at trial.  Although counsel significantly attacked the credibility of Moore and the other witnesses, counsel did not suggest that Moore had killed the victim, nor was there any evidence presented on such a theory.  Even had Bowman been allowed to testify that Moore was "tracking" petitioner's movements on February 17, it would have provided scant evidence that Moore herself committed the murder.  This is particularly so in light of the complete absence of any other evidence implicating Moore, petitioner's admission that he was in the home between the time Moore first visited and then later discovered the victim's body, and Moore's calling the police herself.  In these circumstances, petitioner cannot show that the exclusion of Bowman's testimony undermined a fundamental aspect of his defense, and thus he cannot show that he was denied the right to present a defense.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Jury Claims (Claims VII & IX)*

Petitioner next raises two claims relating to his jury.  First, he contends that the jury was improperly instructed.  Second, he contends that an extraneous influence affected the jury's verdict.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Instructional Error (Claim VII)*

Petitioner contends that he was denied a fair trial by the trial court's handling of and instructing the jury on the videotape of the victim's testimony in the visitation hearing, and by the trial court's response to the jury's note requesting a clarification of premeditation.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

*a. Clearly Established Law*

In order for habeas corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Wood v. Marshall*, 790 F.2d 548, 551-52 (6th Cir. 1986); *cf. United States v. Sheffey*, 57 F.3d 1419, 1429-30 (6th Cir. 1995) (standard of review for jury instructions challenged on direct criminal appeal). As the Supreme Court noted in *Estelle*, the Court should "also bear in mind [the Supreme Court's] previous admonition that we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *See Estelle*, 502 U.S. at 72 & 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). In short, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *See Estelle*, 502 U.S. at 71-72.

### b. Analysis

With respect to the videotape of the victim's testimony, although there was some initial confusion as to whether the tape itself was admitted into evidence as an exhibit the parties eventually stipulated "that the videotape should be considered as testimony presented in trial. The actual tape . . . is not an admitted exhibit for consideration by the Jury and that all other Exhibits that were requested would be given to them." Trial Tr., Vol. V, at 29-30. Petitioner contends that, because the court had instructed that all of the exhibits be maintained together, and because it appeared that the tape was initially admitted as an exhibit, the video probably found its way into the jury room.

41

There is no evidence, however, other than petitioner's speculation that the videotape was given to the jury during its deliberations. And, indeed, the stipulation was made in specific response to a request from the jury for all exhibits, suggesting that videotape was not, in fact, given to the jury. *See id*. at 30  Petitioner does not point to any error in the court's instructions regarding the videotape. Thus, petitioner has identified no basis for habeas relief with respect to the victim's videotaped testimony.

Petitioner also contends that he was denied a fair trial when the court responded to the jury's request for clarification of the premeditation instruction by simply telling them to reread the instruction. *See* Trial Tr., Vol. V, at 34. Petitioner argues that the court had a duty to clarify the instruction, rather than simply directing the jury to reread the premeditation instruction already given. Petitioner does not contend that there was any error in the premeditation instruction which was given to the jury. It is well established that "if the original jury charge clearly and correctly states the applicable law, the judge may properly answer the jury's question by instructing the jury to reread the instructions." *United States v. Span*, 170 F.3d 798, 802 (7th Cir. 1999) (internal quotation omitted); *see also*, *United States v. Anwar*, 428 F.3d 1102, 1114 (8th Cir. 2005); *Moceri v. Stovall*, No. 2:06-CV-15009, 2008 WL 4822063, at *15 (E.D. Mich. Nov. 4, 2008) (Roberts, J.). Because petitioner does not identify any error in the original premeditation instruction, and because that instruction clearly defined premeditation under the law, *see* Trial Tr., Vol. V, at 16, 18, petitioner was not denied a fair trial by the court's instruction to the jury that it reread the instructions originally given. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Extraneous Influence (Claim IX)*

Petitioner also contends that there was an extraneous influence on the jury's deliberations. Specifically, he contends that Marjorie Bowman witnessed his ex-wife talking to one of the jurors during the jury's mid-deliberation lunch break. Petitioner first brought this matter to the trial court's attention at sentencing, and requested a hearing prior to sentencing. The judge queried petitioner as to whether he could cite any law that required the hearing be held prior to the imposition of sentence. Apparently finding no law that required this course of action, the trial judge imposed sentence. *See* Sentence Tr., at 20. Petitioner did not raise this matter again until he filed his habeas application in this court. Petitioner contends that he is entitled to habeas relief based on the trial court's failure to hold a hearing on this matter. The Court should disagree.

### a. Clearly Established Law

The Sixth Amendment guarantees a criminal defendant the right to a trial by an impartial jury. *See Duncan v. Louisiana*, 391 U.S. 145, 147-49 (1968). Thus, a defendant is entitled to a have a panel of impartial, "indifferent" jurors. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961). In *Remmer v. United States*, 347 U.S. 227 (1954), the Court held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer*, 347 U.S. at 229. Although *Remmer* spoke of a "presumption of prejudice," the Court has subsequently indicated that a defendant alleging improper juror contact must demonstrate actual prejudice. In *Smith v. Phillips*, 455 U.S. 209 (1982), the Court cited *Remmer* in stating that "[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the

43

defendant has the opportunity to prove bias." *Smith*, 455 U.S. at 215.  As the Court explained:

> [D]ue process does not require a new trial every time a juror has been placed in a
> potentially compromising situation. Were that the rule, few trials would be
> constitutionally acceptable. . . .  [I]t is virtually impossible to shield jurors from
> every contact or influence that might theoretically affect their vote. Due process
> means a jury capable and willing to decide the case solely on the evidence before it,
> and a trial judge ever watchful to prevent prejudicial occurrences and to determine
> the effect of such occurrences when they happen.

*Smith*, 455 U.S. at 217.   In light of *Smith*, the presumed prejudice language of *Remmer* is no longer

good law; all that is required is a hearing at which the defendant is given the opportunity to establish

that the improper contact caused actual prejudice.  *See United States v. Pennell*, 737 F.2d 521, 532-

33 (6th Cir. 1984); *see also*, *United States v. Olano*, 507 U.S. 725, 739 (1993) (whether viewed as

a presumed prejudice test or a case-by-case determination, question in all cases is "did the intrusion

affect the jury's deliberations and thereby its verdict."); *United States v. Corrado*, 304 F.3d 593, 603

(6th Cir. 2002).  Petitioner contends that counsel should have requested such a hearing.

### b.  Analysis

Contrary to respondent's argument, a hearing is not required every time a mere possibility

of juror bias is raised.  To be entitled to a *Remmer* hearing, a defendant "must do more than simply

raise the possibility of bias."  *United States v. Vining*, 224 Fed. Appx. 487, 492 (6th Cir. 2007)

(internal quotation omitted).  Rather, the defendant "must make a colorable claim of extraneous

influence," that is, "one derived from specific knowledge about or a relationship with either the

parties or their witnesses."  *Id*. at 492-93.  A court "should consider the content of the allegations,

the seriousness of the alleged misconduct or bias, and the credibility of the source when determining

whether a hearing is requried."  *Sims v. Rowland*, 414 F.3d 1148, 1155 (9th Cir. 2005) (internal

quotation omitted).  Further, courts "are always reluctant to haul jurors in after they have reached

a verdict in order to probe for potential instances of bias, misconduct or extraneous influences" because doing so may "subject[] juries to harassment, inhibit[] juryroom deliberation, burden[] courts with meritless applications, increas[e] temptation for jury tampering and creat[e] uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (internal quotation omitted). Thus, to be entitled to a post-trial hearing a defendant must "come[] forward with clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred." *Id.* (internal quotation omitted); *see also*, *United States v. Anwo*, 97 Fed. Appx. 383, 386-87 (3d Cir. 2004).

Here, petitioner has never presented any evidence of an improper juror contact other than his own assertion of Bowman's hearsay statement to him. Although petitioner brought this matter to the trial court's attention at sentencing, the court found that sentencing was not the appropriate time to address the matter. However, "the trial court did not prevent defense counsel from requesting a hearing at a later point." *Mays v. Chandler*, No. 6:06-426, 2007 WL 2903212, at *7 (E.D. Ky. Sept. 28, 2007). Despite this, petitioner did not renew his request for a hearing, nor raise the matter on appeal; indeed, petitioner did not again assert this matter until he filed his habeas petition in this Court. Further, petitioner has yet to bring forth any "competent evidence of any improper contact with the jury," and "even now there is no such evidence." *Ida v. United States*, 207 F. Supp. 2d 171, 186 (S.D.N.Y. 2002). Petitioner's bare assertion of what he was told by Bowman does not constitute evidence of an improper jury contact. The assertion lacks any detail regarding the nature of the alleged contact, how Bowman knew that the person talking with petitioner's wife was a juror, or the matters discussed. Although a hearing was not held, petitioner could have supported his claim in any number of ways, for example, by obtaining affidavits from

45

the jurors or, more simply, from Bowman, who testified on his behalf at trial.[3]  *See Hasan v. Ishee*, No. 1:03-cv-288, 2006 WL 3253081, at *19 (S.D. Ohio Aug. 14, 2006).  There is no basis in the record to conclude that an extraneous influence was actually brought to bear on the jury, or that a showing of such an influence sufficient to require a hearing was presented to the state courts.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.    *Suppression of Evidence (Claim VIII)*

Petitioner next raises a number of claims alleging that the prosecution improperly suppressed evidence.  Specifically, he contends that the prosecution suppressed the identity of a *res gestae* witness, destroyed exculpatory physical evidence, and failed to produce court ordered discovery material.  The Court should conclude that the petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Due Process Clause requires the state to disclose exculpatory evidence to the defense. *See Brady v. Maryland*, 373 U.S. 83 (1963).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, in order to establish a *Brady* claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt.  *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d

---

[3]Although Bowman was called by the prosecution, she testified that she was friendly with petitioner and had previously dated him.  Her testimony was generally favorable to petitioner, explaining his demeanor on the night of the murder and providing an innocent explanation for the scratches on his hands.

626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972).  Petitioner bears the burden of establishing each of these three elements.  *See Carter*, 218 F.3d at 601.  Further, although *Brady* requires disclosure of exculpatory evidence, it is well established, that "*Brady* . . . does not require the government to create exculpatory material that does not exist."  *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980); *see also*, *Richards v. Solem*, 693 F.2d 760, 766 (8th Cir. 1982) ("Although the state has a duty to disclose evidence, it does not have a duty to create evidence.").

The *Brady* rule extends to evidence which is not suppressed, but is lost or destroyed.  *See California v. Trombetta*, 467 U.S. 479, 489 (1984).  This rule, however, applies only to material exculpatory evidence, that is, evidence which "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Id*. at 488-89. However, "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  In a case involving potentially useful evidence, the defendant must "show bad faith on the part of the police."  *Id*.; *see also*, *Illinois v. Fisher*, 540 U.S. 544, 548 (2004) (per curiam).  As the Sixth Circuit has explained, *Trombetta* and *Youngblood* establish "[s]eparate tests . . . to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, versus cases where 'potentially useful' evidence is not accessible."  *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001).

Where the *Youngblood* bad faith requirement applies, "[t]he presence or absence of bad faith by the [government] for the purposes of the Due Process Clause must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id*. at 56 n.*.  Thus, "where the government is negligent, even grossly negligent, in failing to preserve potential exculpatory evidence, the bad faith requirement is not satisfied." *Wright*, 260 F.3d at 571; *see also*, *United States v. Garza*, 435 F.3d 73, 75 (1st Cir. 2006).  Further, the requirement that a defendant show bad faith is not eliminated by the existence of a pending discovery request for the evidence, *see Fisher*, 540 U.S. at 548, nor does it depend on "the centrality of the contested evidence to the prosecution's case or the defendant's defense[.]" *Id*. at 549.

    2.    *Analysis*

*a. Witness Identity*

Petitioner first contends that the police suppressed favorable evidence by failing to identify and question two deputy sheriffs who had been conversing with the victim and his ex-wife when he supposedly made his threat to the victim.  He contends that these deputy sheriffs witnessed him turning his back on the victim and his ex-wife, and would have contradicted the evidence that he threatened the victim.  This claim fails, for two reasons.  First, as noted above, the prosecution has no duty to create exculpatory evidence which does not exist.  Thus, "it is not required that governmental authorities take affirmative steps to interview all possible witnesses so as to assist the defense." *Delgado v. New York City Dep't of Correction*, 842 F. Supp. 711, 712 (S.D.N.Y. 1993); *see also*, *United States v. Rettinger*, No. 4:06-cr-43, 2006 WL 3193701, at *3 (D.N.J. Nov. 1, 2006).  Second, petitioner has provided no basis to believe that the deputies' testimony would have been material.  According to petitioner, the two deputy sheriffs were conversing with the victim and his

ex-wive prior to their exiting the courthouse.  However, both Moore and petitioner's ex-wife testified that the threat occurred outside the courthouse, as they were leaving the building.  Thus, any interaction between petitioner, his ex-wife, and the victim which was witnessed by the deputies inside the courthouse would not have been relevant to whether petitioner had threatened the victim once they left the building.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b.  Destruction of Evidence

Petitioner also contends that the prosecution destroyed evidence.  Specifically, he contends that the prosecution destroyed the blood evidence taken from under the victim's fingernails, which was not sent for DNA testing.  At trial, Woodford testified that the reddish stains on the victim's fingernails were tested to determine if they were blood, and that the result was positive.  He further testified that he attempted to conduct another test to determine if the source of the blood was human or animal, but that the sample sizes were too small to conduct the test.  Both samples were destroyed in the testing process.  *See* Trial Tr., Vol. II, at 180-81.

Here, the blood stain evidence did not have an exculpatory value that was apparent; rather, the most that can be said is that further DNA testing could have provided exculpatory evidence.[4]

---

[4]It is questionable whether the blood stains had even a potentially exculpatory value, because it is questionable whether even absent the destruction there would have been sufficient material for testing.  The polymerase chain reaction (PCR) method of DNA testing generally requires a sample size of one to five billionths of a gram of DNA, and the restriction fragment length polymorphism (RFLP) method generally requires a sample size of 50 billionths of a gram of DNA.  *See* David H. Kaye & George F. Sensabaugh, Jr., *Reference Guide on DNA Evidence*, in REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 504 (Federal Judical Ctr. 2d ed. 2000).  In a typical sample, a 1 cm x 1 cm sample of blood contains 200 nanograms–200 billionths of a gram–of DNA, while a 1 mm x 1 mm sample contains only 2 nanograms–2 billionths of a gram.  Given that the samples were trace scrapings from the victim's fingernails, it is likely that the samples were in the millimeter, as opposed to centimeter, range.  Because, as discussed below, there was no bad faith, the Court need not resolve whether this evidence was potentially material and exculpatory.

Thus, under *Youngblood*, petitioner must show that the evidence was destroyed in bad faith. Petitioner cannot do so. Woodford testified that the samples were destroyed as a result of the testing done to determine if they were blood, and if that blood was human. Petitioner offers nothing to show that the decision to test these matters first resulted from a bad faith intent to destroy any evidence, or that there was any bad faith on the part of Woodford in the manner in which the testing was conducted. As a state supreme court has recently observed, "[s]ince the United States Supreme Court has clarified the due process materiality standard for evidence not preserved by the prosecution, federal and state courts alike have concluded that the Due Process Clause places no constraints on the good faith consumptive or destructive testing of evidence by the prosecution." *People v. Wartena*, 156 P.3d 469, 475 (Colo. 2007); *see also*, *Carlson v. Minnesota*, 945 F.2d 1026, 1029 (8th Cir. 1991); *United States v. Stevens*, 935 F.2d 1380, 1387 (3d Cir. 1991); *Garrett v. Lynaugh*, 842 F.2d 113, 116 (5th Cir. 1988). Because the blood evidence did not have an immediately apparent exculpatory value, and because the evidence was destroyed in good faith as part of the testing process, petitioner cannot establish a due process violation under *Youngblood*.[5] Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Discovery Material

Petitioner next contends that the prosecution suppressed evidence which it had been ordered to produce by the trial court. Specifically, petitioner contends that prosecution suppressed a number

---

[5]Petitioner points to a number of factors which he contends establish that the Madison Heights Police Department's investigation was, on the whole, conducted in bad faith. None of these factors, however, is relevant to petitioner's claim. Under *Youngblood*, the question is not whether the police were motivated by bad faith in general, but whether the particular item of evidence not maintained by the state was destroyed in bad faith. Even if other aspects of the investigation show bad faith on the part of the police, petitioner has offered nothing to show that Woodford (who worked for the state police lab, and not the Madison Heights Police Department) destroyed the evidence in bad faith rather than as part of the good faith testing of the samples to determine if they consisted of human blood.

of transcripts of the child custody proceedings between he and his ex-wife, social services reports regarding his children, police reports made by or concerning his brother and Moore, and records of phone calls between Moore and the victim.  Petitioner contends that all of these items of evidence would have established his brother's and Moore's motive to murder the victim and frame him.  The Court should conclude that petitioner is not entitled to relief on this claim.

With respect to the civil case transcripts and the phone records, petitioner cannot show that the prosecution suppressed any evidence, for two reasons.  First, suppression under *Brady* occurs only where the prosecution fails to disclose evidence in its possession, or in the possession of other state actors, such as police, acting on behalf of the prosecution.  *See Kyles*, 514 U.S. at  435-40.  Here, there is no evidence that the police or prosecutor ever possessed the numerous transcripts which petitioner contends should have been produced.  Further, although the prosecution produced some phone records, there is no evidence that the other phone records petitioner sought were ever in the possession of the police or prosecution.  Second, it is well established that "[t]here is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (internal quotations omitted); *see also*, *Spirko v. Mitchell*, 368 F.3d 603, 610 (6th Cir. 2004).  Here, petitioner clearly knew of the facts about which he sought discovery, and he offers no reason why he could not himself have obtained the transcripts of the prior court proceedings which were part of the public record and to which he was a party, or why he could not have subpoenaed the relevant phone carriers for their records.  Because this information was known to petitioner and could easily have been obtained by him, there was no suppression under

*Brady*.

With respect to the remaining evidence which petitioner contends was suppressed, as well as the phone records and state court transcripts, petitioner cannot show that the evidence was material, exculpatory evidence. Under *Brady*, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *accord Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J.). Petitioner argues that the evidence would have been relevant to show that both his brother and Moore had a motive to kill the victim and frame him for the murder. As discussed above in connection with petitioner's evidence claim, however, petitioner's counsel did not present such a defense at trial, and for good reason. Even if the evidence allegedly suppressed would have established some motive on the part of Moore and his brother, petitioner has not pointed to a scintilla of evidence beyond this motive which would implicate either his brother or Moore. The limited physical and circumstantial evidence which did exist all pointed to petitioner, not his brother or Moore. In light of the evidence presented at trial, petitioner's defense, and the limited utility of the supposedly suppressed evidence in showing that Moore or petitioner's brother murdered the victim, there is not a reasonable probability that the result of the proceeding would have been different had the allegedly suppressed evidence been disclosed. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.       *Speedy Trial (Claim X)*

Petitioner next contends that he was denied his right to a speedy trial because he was arrested

on February 24, 1993, and his trial did not begin until March 11, 1997.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

      1.    *Clearly Established Law*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. CONST. amend. VI.  The Supreme Court has adopted a balancing test for determining whether a delay between arrest or indictment and trial violates the Speedy Trial Clause.  Under this test, the Court must balance four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  The length of delay and reason for delay factors are closely related.  *See id*. at 531.  As the Supreme Court has explained, the length of delay factor

> is actually a double enquiry. Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay, since, by definition, he cannot complain that the government has denied him a "speedy" trial if it has, in fact, prosecuted his case with customary promptness. If the accused makes this showing, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim. This latter enquiry is significant to the speedy trial analysis because . . . the presumption that pretrial delay has prejudiced the accused intensifies over time.

*Doggett v. United States*, 505 U.S. 647, 651-52 (1992) (citations omitted); *see also*, *Barker*, 407 U.S. at 530 ("The length of the delay is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.").  Although there is no bright-line rule and the delay must be considered in light of the circumstances and complexities of the individual case, delay generally becomes presumptively prejudicial as it approaches one year.  *Cf. Doggett*, 505 U.S. at 652 n.1.

With respect to the factor addressing the reason for the delay, the Court explained in *Barker*

that "different weights should be assigned to different reasons."  *Barker*, 407 U.S. at 531.  As the

Ninth Circuit has explained,

> the following principles guide attribution of the delay to either the defense or the
> prosecution. A deliberate attempt to delay proceedings to hamper the defense counts
> heavily against the government. "A more neutral reason such as negligence or
> overcrowded courts should be weighed less heavily, but nevertheless should be
> considered since the ultimate responsibility for such circumstances must rest with the
> government rather than the defendant." On the other hand, delay attributable to the
> defendant's own acts or to tactical decisions by defense counsel will not bolster
> defendant's speedy trial argument.

*McNeely v. Blanas*, 336 F.3d 822, 827 (9th Cir. 2003) (citations omitted) (quoting *Barker*, 407 U.S.

at 531).  In other words, the "portions of delay which are attributable to the defendant or his counsel

will not be considered for purposes of determining whether the defendant's right to a speedy trial

has been violated."  *Gattis v. Snyder*, 278 F.3d 222, 231 (3d Cir. 2002) (internal quotation omitted).

Finally, with respect to the prejudice factor, the Supreme Court has explained that

"unreasonable delay between formal accusation and trial threatens to produce more than one sort

of harm, including 'oppressive pretrial incarceration,' 'anxiety and concern of the accused,' and 'the

possibility that the [accused's] defense will be impaired' by dimming memories and loss of

exculpatory evidence.  Of these forms of prejudice, 'the most serious is the last, because the inability

of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Doggett*, 505

U.S. at 654 (citations omitted) (quoting *Barker*, 407 U.S. at 532) (alternation in original).  When

"the portion of the delay attributable to the Government's negligence far exceeds the threshold

needed to state a speedy trial claim," the presumption of prejudice grows stronger and therefore the

defendant's need to demonstrate actual prejudice diminishes.  *Id*. at 658.

     2.    *Analysis*

In considering petitioner's claim, the court of appeals found 33 months of the delay attributable to petitioner.  This 33 months consisted of the six months spent on petitioner's interlocutory appeal to the Michigan Court of Appeals, eight months spent on his application for leave to appeal that decision to the Michigan Supreme Court, and 19 months of delay resulting from his three changes in defense counsel and the adjudication of various defense motions.  *See Kowalak*, No. 203164, 1998 WL 1988815, at *1.  The court broke down the remaining 15 months of delay as follows: three months resulting from docket congestion in the trial court; 18 days resulting from an expert's unavailability for an evidentiary hearing, three days resulting from a death in the prosecutor's family, and eight months which appeared to be the mutual responsibility of the prosecution and petitioner.  *See id*. at *1 & n.2.  The court concluded that although these periods of delay were "technically attributable to the prosecutor," they were "of sufficiently neutral character that we attach only minimal weight to their occurrence."  *Id*. at *1.  Turning to the third *Barker* factor, the court of appeals noted that petitioner did not "formally assert his right to a speedy trial until he brought a motion to dismiss on that ground some twenty-eight months after he was initially charged," but also that petitioner had "informally asserted that right through a letter-writing campaign directed at the trial judge during 1993."  *Id*. at *2.  Nevertheless, the court of appeals concluded that this factor did not weigh in petitioner's favor because his purported assertions of his right to a speedy trial were inconsistent with his conduct, which included thrice changing counsel, pursuing an interlocutory appeal, stipulating to delays, and filing numerous motions.  *See id*.  Finally, with respect to prejudice, the court of appeals reasoned that "because almost all of the delay is either directly attributable to defendant or extenuated by his acquiescence, defendant may not rely on unspecified presumptive prejudice."  *Id*. at *2 (citing *Doggett*, 505 U.S. at 658).  With respect

55

to actual prejudice, the court explained that petitioner has failed to show any prejudice to his defense, such as missing witnesses or evidence, caused by the delay, and reasoned that petitioner's anxiety while awaiting trial was "of minimal importance in the scale of things when weighed against the offenses charged." *Id.* (internal quotation omitted). The court thus concluded: "Because defendant caused most of the delay, defendant's own conduct substantially contradicted his assertion of the right to a speedy trial, and defendant suffered only minimal prejudice from the delay, we conclude that the passage of forty-eight months between arrest and trial in this case does not constitute a violation of the right to a speedy trial." *Id.* at *3. The Court should conclude that this determination was reasonable.

At the outset, the court of appeals's findings regarding the length of each portion of delay and the factual reasons for each of those portions are findings of fact which, under § 2254(e), are presumed correct. *See Wilson v. Mitchell*, 250 F.3d 388, 394-95 (6th Cir. 2001); *Norris v. Schotten*, 146 F.3d 314, 327 (6th Cir. 1998). These findings are supported by the state court record in this case, and petitioner has neither presented any clear and convincing evidence to rebut these factual findings, *see* 28 U.S.C. § 2254(e)(1), nor has he shown that the court of appeals's determination of these facts was unreasonable under § 2254(d)(2). Likewise, there is no question that the court of appeals applied the *Barker* factors, and thus the court's decision was not contrary to *Barker* or any other clearly established federal law. Thus, the only question for this Court is whether the court of appeals's application of the *Barker* factors to the historical facts that it found was reasonable, a question the Court should answer in the affirmative.

With respect to the first two *Barker* factors, the court of appeals did not err in either the assignment of responsibility for the various delays or the weight accorded the delays which were

attributable to the government.  The time petitioner spent pursuing his interlocutory appeals was properly attributed to petitioner.  As the Supreme Court has explained, "[a] defendant who resorts to an interlocutory appeal normally should not be able to return to the [trial] court to reap the reward of dismissal for failure to receive a speedy trial."  *United States v. Loud Hawk*, 474 U.S. 302, 316 (1986).  Likewise, the periods of delay resulting from petitioner's repeated requests for substitute counsel are attributable to petitioner, *see United States v. Brown*, 498 F.3d 523, 531 (6th Cir. 2007), as are the periods of delay occasioned by the need for the court to rule on petitioner's pretrial motions, *see United States v. O'Dell*, 247 F.3d 655, 668 (6th Cir. 2001).  The remaining 15 months of delay, the court of appeals correctly found, were for neutral reasons such as docket congestion, scheduling conflicts with the witnesses or prosecution, or delays mutually requested by the parties.  Thus, these delays, although attributable to the government, are not given great weight.

With respect to the third *Barker* factor, the court of appeals correctly concluded that this factor did not weigh in petitioner's favor.  Although petitioner purported to assert his speedy trial right in a number of letters to the judge and in a motion to dismiss, his conduct belied his desire to obtain a speedy trial.  Petitioner repeatedly sought to replace appointed counsel, ending up with four different attorneys during the course of the proceedings.  Petitioner also pursued an interlocutory appeal which significantly delayed the proceedings, and filed numerous motions for further discovery.  As the Court explained in *Loud Hawk*, a defendant's assertions of his desire for a speedy trial "must be viewed in light of [the defendant's] other conduct."  *Loud Hawk*, 474 U.S. at 314.  "Where, through contrary actions, a defendant evidences an unwillingness to commence with the trial requested, the request carries minimal weight. . . .  When an incarcerated individual demands a trial, he should be prepared for that trial.  Evidence to the contrary weighs against a speedy trial

57

violation." *Hakeem v. Beyer*, 990 F.2d 750, 765-66 (3d Cir. 1993).  Thus, the court of appeals's failure to weigh this factor in petitioner's favor was not unreasonable.

Finally, the court of appeals's conclusion regarding the prejudice factor was correct.  As the court noted, the "the portion of the delay attributable to the Government's negligence" did not "far exceed the threshold needed to state a speedy trial claim." *Doggett*, 505 U.S. at 658.  At most, the government was responsible for 15 months of delay, only three months beyond the general one-year presumptive prejudice cut-off.  Thus, any presumption of prejudice was slight at best.  Petitioner presented no evidence that his defense was impaired by the length of delay.  He points to no witnesses, testimony, or evidence which was missing from trial as a result of the delay.  *See Robinson v. Whitley*, 2 F.3d 562, 570 (5th Cir. 1993) (where delay is not the result of government misconduct or negligence, defendant "must demonstrate concrete proof of his prejudice.").  And although petitioner undoubtedly suffered anxiety as a result of being charged with murdering his mother, his anxiety is entitled to only minimal weight in light of the charges against him.  *See Barker*, 407 U.S. at 534 (describing as "minimal" the prejudice suffered by the defendant's having lived "for over four years under a cloud of suspicion and anxiety"); *United States v. Williams*, 557 F.3d 943, 949 (8th Cir. 2009) (internal quotation omitted) ("Oppression, anxiety, and concern of the accused are undoubtedly present to some degree in every case.  However, that alone does not establish prejudice where the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific circumstances.").

Thus, the court of appeals reasonably concluded that: (1) the bulk of the delay was attributable to petitioner, (2) the prosecution was responsible at most for 15 months of delay; (3) the reasons for the prosecution's delay was neutral; (4) petitioner's conduct did not evince a desire for

58

a speedy trial; (5) the delay attributable to the prosecution was not sufficiently long to create a strong presumption of prejudice; and (6) petitioner has failed to show any actual prejudice to his defense. From these reasonable factual findings and intermediate legal conclusions, the court of appeals's balancing of the *Barker* factors and ultimate conclusion that petitioner was not denied his right to a speedy trial was reasonable, as demonstrated by a number of similar cases. *See, e.g.*, *Conroy v. Leone*, ___ Fed. Appx. ___, 2009 WL 597592, at *3-*4 (3d Cir. Mar. 9, 2009) (state court reasonably concluded that petitioner was not denied speedy trial by delay of four years between arrest and trial in light of neutral reasons for delay, petitioner's failure to assert his speedy trial right, and absence of any actual prejudice); *United States v. Artez*, 290 Fed. Appx. 203, 208 (10th Cir. 2008) (defendant not denied right to speedy trial by five year delay where the defendant was responsible for most of the delay, he did not timely assert his desire for a speedy trial, and he failed to show any actual prejudice); *O'Dell*, 247 F.3d at 667-73 (over four year delay did not result in a speedy trial violation in light of fact that much of delay was caused by government's and defendant's interlocutory appeals, defendant did not timely assert his speedy trial rights, and defendant failed to demonstrate any prejudice).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

J.      *Ineffective Assistance of Counsel (Claims II & III)*

Finally, petitioner contends that his trial and appellate attorneys rendered constitutionally deficient performance.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect

the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*.  at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id*. at 695.

2.    *Analysis*

a. *Trial Counsel*

Petitioner's principal claim with respect to trial counsel focuses on counsels's failure to

pursue a defense directed at establishing that Moore and petitioner's brother murdered the victim to obtain the proceeds of the victim's estate and to frame petitioner for the murder because of animosity between petitioner on the one hand and his brother and Moore on the other.  Petitioner cannot show, however, that counsel's performance was deficient in this regard.  Decisions about what defenses to pursue or not pursue are "[a]mong the 'virtually unchallengeable' tactical decision left to the judgment of trial counsel." *Gluzman v. United States*, 124 F. Supp. 2d 171, 174 (S.D.N.Y. 2000).  Here, the evidence against petitioner consisted of some relatively weak circumstantial evidence coupled with the victim's hearsay statement to Moore that defendant had threatened her.  In light of this evidence, it was a reasonable trial strategy to attack the reliability of Moore's testimony and the probative value of the circumstantial evidence, matters which counsel pursued with vigor.  To this day, petitioner has pointed to absolutely no evidence supporting his theory that his brother and Moore murdered the victim.  The only evidence petitioner points to is circumstantial evidence that they may have had a motive to do so, although this motive (financial gain and animosity toward petitioner) was very general.  In the absence of any evidence beyond motive to support petitioner's theory, counsel was more than reasonable in concluding that the best strategy was to mount a general reasonable doubt defense attacking the strength of the prosecution's evidence and the inferences drawn from that evidence by the prosecution, rather than what might well have appeared to the jury as a desperate attempt to blame someone else for a murder that petitioner committed.  Nor, in light of the lack of evidence supporting his theory, can petitioner show a reasonable probability that the result of his trial would have been different had counsel pursued his preferred theory of defense.

The bulk of petitioner's remaining claims relating to trial counsel are derivative of his claim

that counsel should have pursued a defense theory that his brother and Moore murdered the victim. Petitioner claims that counsel was ineffective in his handling of discovery and questioning of various witnesses.  As best as can be gleaned from petitioner's long narrative, all of these claims derive from his more general claim that counsel should have attempted to prove that his brother and Moore were the murderers.  Because counsel reasonably chose not to pursue this line of defense, petitioner cannot show that he was prejudiced by counsel's failure to seek discovery of information supporting this theory and to question witnesses regarding the animosity between petitioner and his brother or Moore.

Petitioner also claims that counsel erred in not requiring that the entire videotape of the proceedings in which the victim testified against petitioner be shown to the jury.  However, petitioner does not explain how anything in the video beyond the victim's testimony was relevant in the criminal case against him.  With respect to counsel's failure to call the two deputy sheriffs who supposedly witnessed the confrontation between petitioner and the victim at the courthouse, as explained in connection with petitioner's suppression of evidence claim the testimony at trial revealed that the threat was made outside the courthouse after the initial confrontation inside the courthouse in front of the deputies.  Thus, the deputies would not have been able to offer any relevant testimony with respect to whether petitioner made the threat once outside the courthouse.

Finally, petitioner contends that counsel was ineffective for failing to seek a *Remmer* hearing regarding extraneous jury influence.  Petitioner contends that, although he himself did not bring the matter to the court's attention until sentencing, he told his counsel during deliberations that his ex-wife had been seen by Bowman speaking with one of the jurors.  As explained in connection with petitioner's substantive *Remmer* claim, however, petitioner has provided nothing beyond his own

vague assertion of Bowman's hearsay statement to him to show that an improper contact with the jury actually occurred.  In the absence of any such evidence, petitioner cannot meet his burden of demonstrating that he was prejudiced by counsel's performance.  *See Bedford v. Webb*, No. 2005-82-KKC, 2007 WL 3396498, at *6, *9 (E.D. Ky. Nov. 13, 2007); *Hasan v. Ishee*, No. 1:03-cv-288, 2006 WL 325081, at *19 (S.D. Ohio Aug. 14, 2006); *Ida v. United States*, 207 F. Supp. 2d 171, 186 (S.D.N.Y. 2002).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his ineffective assistance of trial counsel claims.

### b. Appellate Counsel

Petitioner also contends that his appellate counsel was ineffective for failing to raises many of his habeas claims on direct appeal.  With respect to appellate counsel, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).  As noted above, each of petitioner's claims is without merit, and thus counsel was not ineffective for failing to raise them on appeal.

### K.   Conclusion

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

### III.   NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.

63

§ 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver

of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of*

*Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th

Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will

not preserve all the objections a party might have to this Report and Recommendation.  *See Willis*

*v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit*

*Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR

72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response.  The response shall be not more than five (5) pages in length unless by

motion and order such page limit is extended by the Court.  The response shall address specifically,

and in the same order raised, each issue contained within the objections.



                                    s/Paul J. Komives
                                    PAUL J. KOMIVES
                                    UNITED STATES MAGISTRATE JUDGE

Dated: 5/19/09

> The undersigned certifies that a copy of the foregoing
> order was served on the attorneys of record   by
> electronic means or U.S. Mail and Tomas Kowalak at G
> . Robert Cotton Correctional Facility on May 19, 2009.
>
>                           s/Eddrey Butts